386

No. 36,416

W. J. HENDERSON, *Appellee*, v. JOHN DECKERT, doing business as DECKERT OIL COMPANY, ALFRED DENSON and FARMERS MUTUAL HAIL INSURANCE COMPANY, *Appellants*.

(162 P. 2d 88)

Opinion filed October 6, 1945.

W. A. Kahrs, of Wichita, argued the cause, and *Austin M. Cowan, Robert H. Nelson, Henry L. Butler* and *Clarence N. Holeman,* all of Wichita, were on the briefs for the appellants.

*Henry E. Martz* and *George B. Powers,* both of Wichita, argued the cause, and *Fred W. Aley, Robert C. Foulston, George Siefkin, Samuel E. Bartlett, Stuart A. Carter* and *Thomas E. Woods,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.: The plaintiff brought this action to recover damages for injuries received in an automobile accident. By answers to special interrogatories a jury allowed him $15,785. That amount was reduced $3,120 by the district court and judgment rendered for $12,665. The defendants appeal.

On the evening of June 24, 1943, W. J. Henderson, who was a laborer and worked for the Wichita nurseries, was riding in the back end of a pickup truck belonging to his employer when it was struck from the rear by a gas transport truck owned by the defendant John Deckert doing business as Deckert Oil Company, and driven by defendant Alfred Denson. As a result the pickup truck was thrown from the highway a distance of about 175 feet into a field and Henderson was seriously injured. Subsequently he brought suit, charging negligent operation of the gas transport truck, against such driver, the owner of the truck, and the Farmers Mutual Hail Insurance Company.

In the court below no question was raised as to the pleadings or parties. The defendants' answer conceded negligence on the part of the driver, Denson. During the trial which commenced on February 4, 1945, it was admitted Denson was acting as the servant and employee of the oil company at the time of the accident and that the defendant insurance company had issued a policy of insurance covering the truck in question under the terms of which its maximum liability was $10,000 for any one person. It was further admitted the actual bills incurred by the plaintiff amounted to $831.35 and it was stipulated his life expectancy on the date he was injured was 8.97 years. In fact the only controverted issues for determination were the extent of plaintiff's disability as a result of the accident and the amount of his recovery.

A careful review of the record insofar as it relates to plaintiff's situation up to the date of the accident reveals no dispute in the testimony as to the following facts: He was 69 years of age; his work at the nursery consisted of digging holes for setting shrubs, evergreens and shade trees; when unemployed there he worked on a transfer wagon; he kept steadily employed, was a good workman and was industrious and dependable; his work compared favorably to that of other employees; he never complained of physical infirmities or asked for lighter work and so far as his employer or fellow employees were concerned they observed no physical disability which interfered with his ability to perform the duties required of him by the work in which he was engaged.

With respect to earning power prior to the accident there is some confusion, but the plaintiff's testimony in regard thereto is not challenged by the defendants. Mr. Schell, the owner of the Wichita Nursery, stated that in June, 1943, Henderson was earning 60 cents per hour and averaged about $27 per week *net* (emphasis supplied). Just what was meant by use of the word "net" is not disclosed. The plaintiff himself, without stating the source from whence it came or the period of time involved, testified on one occasion that his average weekly wage ran up to $35 or $36 and sometimes more. On another, and again without fixing the date to which he had reference, he stated his wage ran from $25 to $27 up to $35 per week.

As to the extent of plaintiff's injuries less dispute exists than is usually to be found in personal injury actions. Time and space will not permit relation in detail of the evidence adduced on that subject. It will be summarized as briefly as the state of the record will permit.

Immediately after the accident plaintiff was taken to the hospital. When first observed by a doctor he was suffering from mild shock and obviously in great pain. Examination disclosed his injuries were severe and his condition to be as follows: (1) Hanging from his left heel there was a flap of skin two to two and one-half inches wide and two and a half to three inches long which had been torn away from the weight-bearing surface thereof. It was right down to the periosteum—the fibrous envelope which covers the bone. (2) The bones of his left foot were crushed and mashed together and the arch of such foot was greatly exaggerated. (3) He had a compressed fracture of the third lumbar vertebra, otherwise described as a fracture of the arch of the back. (4) His eighth, ninth and tenth ribs on the left side were fractured.

Plaintiff remained in the hospital from June 24, 1943, to August 26, 1943. While there three different casts were applied to his left foot and his body from just below his arms to down around his hips was encased in a plaster cast. This body cast was changed from time to time but was worn until November 23, 1943. When finally removed it was replaced by a Taylor back brace—a large steel brace built to fit the patient and maintain the body in such a position as to facilitate proper healing of the fractured vertebra. At the time of his release from the hospital plaintiff was on crutches and remained on them for several months. Later he walked with the aid of a cane for a couple of months. Thereafter, and at the time of the trial, he was able to walk, although with a noticeable limp, without supports of such character. During all of the time he experienced the pain and suffering to be expected and usually prevalent in cases where persons have received injuries as serious as those disclosed by the evidence.

With respect to his condition at the time of the trial plaintiff testified at considerable length. We shall not attempt to relate all of the things of which he complained. A few of them were in substance as follows: He had continuous pain in his foot; his back pained him when he changed positions; he was nervous and could not sit comfortably; if he did sit down he could not remain in that position for any length of time without severe pain in his back; he did not rest at night; when he would attempt to get around his back would commence to hurt, he would get weak and unless he wore the Taylor brace—which he was then wearing—he would just seem to slip and fall down; in his opinion he could not bend forward or sideways sufficient to hold a job and was not physically able to work.

On the same subject and in particular with respect to permanent disability, Doctor Crumpacker, who had been his attending physician from the time of the accident to the date of the trial, stated that plaintiff as a result of his accident had an insufficient heel with an insufficient heel pad, a deformed left foot with a disability in the left leg of from eighty-five to ninety-five percent for purposes of manual labor, and a back injury which had resulted in some degree of disability, all of which conditions were permanent. Summarizing his views he said:

"Taking into consideration all of the disability from this accident, that is, his back, his heel, his foot, and his fractured ribs, it is my opinion that he will be unable to hold a job at manual labor of the type or nature of which

he was doing while he was hurt. I don't believe he will be able to compete with other workmen in the open labor market to obtain and hold a job."

Defendants made little, if any, effort to refute plaintiff's evidence as to the seriousness of his injuries, the treatment and time required for his recovery or the extent of his suffering. They produced but one witness whose testimony in any way tended to weaken the force and effect of evidence offered by plaintiff regarding his permanent disability, or dealt with the facts and circumstances to be considered in measuring the amount of his recovery. This witness, a Doctor Curtis, examined plaintiff just prior to the trial. He knew nothing of his condition at the time he entered the hospital or of his course of treatment and progress in recovery other than what he had learned from the history of the case as given to him by plaintiff himself. He had not even examined the X rays taken during the course of treatment. He testified on direct examination that fifty percent would be a fair percentage of disability for the left foot, and that plaintiff could do any kind of work now that he could before that would not require him to work continuously on his foot. His testimony in this regard was considerably weakened when on cross-examination he admitted that when he first examined plaintiff he might have said to him "Mr., you are done for," and further stated "the man is sure disabled because of his foot that he could not pass an examination for any manual work, plant work in any of the plants or anything of that sort." The major portion of Doctor Curtis' testimony had to do with the effect of certain physical infirmities—admitted by plaintiff in his case in chief—with which he was afflicted at the time of the accident and on the date of the trial. He stated, notwithstanding plaintiff's evidence was to the contrary, these afflictions impaired plaintiff's ability to do work prior to the accident, retarded his recovery and were responsible for his condition at the time of the trial so far as his inability to work was concerned. The most that can be said for the testimony of this witness regarding the matters on which he gave his opinion, under the facts and circumstances of this case, is that it raised questions of fact as to them for consideration by the jury and the trial court in determining the amount of plaintiff's recovery.

With the evidence in the state heretofore related the cause was submitted to the jury on special interrogatories, the parties having stipulated the case should be so submitted and that the trial court should render judgment on the answers returned by such jury.

The interrogatories so submitted by the trial court and the answers made thereto by the jury read as follows:

"What do you allow the plaintiff for the following items of damage?
"1. Loss of time? A. $2,400.
"2. Permanent disability? A. $9,360.
"3. Pain and suffering? A. $3,125.
"4. Bills for expenses including all doctor and hospital bills? A. $900."

Defendants promptly filed a motion to set aside the answers to the special questions and for a new trial. When presented the trial court stated that if plaintiff would accept a remittitur of $3,120 it would be overruled. On announcement of acceptance of the remittitur action was taken as indicated and judgment was entered for $12,665.

Appellants' specifications of error are ten in number. Several of them are neither briefed nor argued. Under such circumstances they are regarded as abandoned and receive no consideration on appellate review. (*Bailey v. Dodge*, 28 Kan. 72; *Smith v. Kagey*, 146 Kan. 563, 570, 73 P. 2d 56; *Tawney v. Blankenship*, 150 Kan. 41, 90 P. 2d 1111; *Tri-State Hotel Co., Inc. v. Southwestern Bell Telephone Co.*, 155 Kan. 358, 125 P. 2d 728; *Carrington v. British American Oil Producing Co.*, 157 Kan. 101, 138 P. 2d 463; *Sams v. Commercial Standard Ins. Co.*, 157 Kan. 278, 139 P. 2d 859.)

Grounds of appeal entitled to consideration and which are urged by appellants as a basis for reversal of the judgment will be noted and considered in inverse order of what we deem to be their importance.

The first question to which we give attention is the contention that improper interrogatories were submitted by the trial court. Resort to the record makes it immediately apparent this objection strikes at the form of the interrogatories and is not premised upon the proposition there was no evidence to justify the submission of any question which the jury was required to answer or that any such question was not pertinent to a determination of the issues involved. The gist of appellants' argument is that questions 1 and 2 were ambiguous and susceptible of misunderstanding. Assuming, without conceding, the correctness of appellants' position it does not now lie in their mouths to predicate error on the form of any question. They stipulated the case should be submitted on special interrogatories prepared by the court. In fact the appellee states, and such statement is not denied, they were submitted after inspection and agreement by attorneys for both parties. Be that as it may, the

record fails to disclose appellants made any objection to them or requested that they be differently stated. Having stipulated the case should be submitted on interrogatories prepared by the court and having stood by and permitted their submission without objection appellants waived any objections they may have had as to their form and cannot now be heard to say they were improper.

Another contention is that the jury was so confused in regard to the questions submitted as to require that a new trial be granted. It is not urged confusion existed with respect to questions 3 and 4, bills for expenses and pain and suffering, so this contention, like the one which precedes it, relates solely to questions 1 and 2, loss of time and permanent disability, and the answers thereto.

Much of appellants' argument on this point is based upon their construction of evidence offered by appellee in resisting the motion for a new trial. Without detailing that evidence it should be stated it came from one of the jurors and was adduced by appellee over objection of appellants for the purpose of showing what elements of damage the jury considered in arriving at its ultimate decision as to the amounts to be allowed in its answers to interrogatories 1 and 2. Although examination of that evidence does not lead us to appellants' conclusion it will serve no useful purpose to labor that question further. This court has repeatedly held that a verdict cannot be impeached by inquiries pertaining to matters essentially inhering in the verdict itself. (*L. & W. Rly. Co. v. Anderson*, 41 Kan. 528, 21 Pac. 588; *State v. Keehn*, 85 Kan. 765, 118 Pac. 851; *State v. Taylor*, 90 Kan. 438, 133 Pac. 861; *Jones v. Webber*, 111 Kan. 650, 207 Pac. 837; *Stone v. City of Pleasanton*, 115 Kan. 378, 223 Pac. 312; *Anderson v. Thompson*, 137 Kan. 754, 758, 22 P. 2d 438.) Here the appellants had made no attempt to sustain their position by impeaching the jury's decision with evidence dehors the record. In fact, they could not have done so had they attempted it. We can see no reason why the rule which barred them from showing the elements which went to make up the jury's verdict should not preclude the appellee from making any attempt to bolster it with testimony of like nature. The evidence was improper, the objections thereto should have been sustained and it is entitled to no weight in determining whether appellants' position can be maintained.

It is obvious from what has been said decision of the question depends upon what is to be gleaned from the record itself. In approaching its determination it is well to have clearly in mind the

problem which confronted the trial court on the motion for new trial with respect to the force and effect to be given the answers of the jury. Examination of the statute (G. S. 1935, 60-2918) pertaining to general and special verdicts immediately discloses the situation is not one possessing the attributes specifically contemplated by its applicable provisions. Instead, the decision of the jury, as required by the stipulation entered into between the parties, presents an anomalous one. Embodied there are characteristics to be found in both special and general verdicts. Special because, all ,issues including liability of the appellants having been conceded, the interrogatories as submitted required a special verdict under all the facts and circumstances disclosed by the evidence as to one controverted issue only, namely, the amounts to be allowed for the elements of damage properly recoverable in a personal injury action, and general for the reason that under the same stipulation the answers to such interrogatories were necessarily in effect a pronouncement generally upon all the issues, both controverted and uncontroverted, upon which the trial court was to render judgment in favor of plaintiff. Under such circumstances it is our view it became the duty of the trial court on the hearing of the motion for new trial and is incumbent upon this court on appellate review to simply treat the answers to the special interrogatories as a verdict fixing liability of the appellants in the amounts stated therein on the hydra-headed issue submitted and uphold it if the record discloses evidence which supports such answers, having in mind the well established rule that both special and general verdicts—and we add a verdict which possesses the dual characteristics to which we have heretofore referred— are to be liberally and favorably construed with the view of sustaining them if upon resort to the record that can reasonably be done (2 Thompson on Trials, 2d ed. 1934, § 2654 and *Schwab v. Nordstrom,* 138 Kan. 497, 27 P. 2d 242).

On the hearing of the motion for new trial appellants produced no evidence in support of their position. They argued there, as they do now, that because the answer to question 1 allowed compensation for loss of time in the sum of $2,400 without fixing the period of time that amount covered it precluded the allowance of anything additional for permanent disability in the answer to question 2. It is on that premise they base their argument the jury must have been confused and as a consequence the trial court should have granted them a new trial.

When tested by the rule which we have heretofore' held to be applicable we do not believe the verdict is open to the objection lodged against it by appellants. Otherwise stated, the answer to question 1 does not preclude allowance for permanent disability. It follows that from what appears on the face of the verdict—and it must be kept in mind that is all we have before us on that point—it cannot be successfully argued the jury was confused. The reasons for our conclusion can be briefly stated.

With respect to question 1 the record disclosed appellee was injured on June 24, 1943, and that the trial commenced on February 5, 1945. During that interim more than nineteen months had elapsed. The undisputed testimony was that appellee's average weekly wage prior to that time had been from $27 *net* to $35 per week. Resort to a simple mathematical process reveals the jury properly could, and did, allow compensation for loss of time at the approximate, if not the exact, rate of $30 per week up to the date of the trial.

As to question 2 it was stipulated appellee's life expectancy on the date he was injured was 8.97 years. There was testimony from which the jury could properly find he was wholly incapacitated from the performance of manual labor in the future. Under our decision in *Dyer v. Keith*, 136 Kan. 216, 219, 14 P. 2d 644, we held that in a personal injury action loss of earning subsequent to the date of trial may be included within a finding of permanent disability. Again mathematical computation reveals the amount allowed for permanent disability under the answer to question 2, after deducting the period allowed for loss of time, is less than what could have been allowed for the remainder of appellee's life expectancy. Therefore, there was evidence to sustain such finding.

We have seen fit to dispose of appellants' contention on its merits. Another sound but more technical answer is that by its answers to questions 1 and 2 the jury responded to the queries submitted to it on appellants' stipulation and that when those answers were returned into court they made no application to have the jury respond more specifically or make any other or additional answers. Long ago this court committed itself to the doctrine that when special interrogatories are submitted to a jury objections based upon the ground that its answers are not sufficiently full and specific—and we now add when it is claimed the jury was confused in arriving at such answers—must be made at the time the verdict

is rendered and before the jury is discharged if those contentions are to be available on appellate review (*Hazard Powder Company v. Viergutz,* 6 Kan. 471; *Arthur v. Wallace,* 8 Kan. 267 and *Carlin v. Donegan,* 15 Kan. 495).

For the benefit of those disposed to follow the practice indulged in by the parties in the instant case it should perhaps be added, although we do not here decide the question, that even had the face of the record disclosed some confusion existed in the mind of the jury we entertain serious doubt as to whether under the facts and circumstances here prevailing appellants' contention would be sustained. Assuming, but not conceding, the existence of that situation there certainly was no confusion in the mind of the trial court which heard the evidence and under the stipulation had the duty of rendering judgment on the answers. It approved findings 1, 3 and 4, but in requiring the remittitur stated the amount allowed by question 2 was reduced to $20 per week for a period of six years for the reason it was in doubt as to whether appellee would be able to average more than that sum per week over such period of time. Having stipulated the trial court could take that action, and in the absence of any contention it was confused or did not comprehend the force and effect to be given the answers, when viewed in the light of the entire record, we doubt if appellants are in a position to sucessfully challenge the judgment as rendered by the trial court.

Other contentions advanced by appellants can be considered together. It is claimed the verdict resulted from passion and prejudice on the part of the jury, that the damage allowed by it in its answers was excessive and that the judgment rendered on such answers was likewise excessive.

There is, of course, no uniformity in our decisions on the proposition of when damages allowed in a personal injury action are excessive for the simple reason determination of that question necessarily depends upon the facts and circumstances of each particular case as it is presented for review. Recognized in every case, however, irrespective of its results, is the now well-established doctrine that in order for a judgment to be set aside as excessive it must appear that it is so large as to shock the conscience of the court. See *Carlisle v. Union Public Ser. Co.,* 137 Kan. 636, 21 P. 2d 395; *Weaver v. Snyder,* 139 Kan. 144, 147, 29 P. 2d 1096; *Sponable v. Thomas,* 139 Kan. 710, 724, 33 P. 2d 721; *Lewis v. Montgomery*

*Ward & Co.,* 144 Kan. 656, 664, 62 P. 2d 875. Many other cases to the same effect are to be found but they would only further emphasize the rule and time and space will not permit their citation.

That the verdict in this case was liberal is beyond dispute. However, under the rule when we give full credence to all the testimony adduced by the appellee, heretofore set forth in detail, which we are required to do because the jury gave it such credence, we cannot say the verdict was sufficiently excessive, if actually excessive, as to evidence passion and prejudice on the part of the jury or to require the granting of a new trial. Obviously, under such circumstances, since the trial court in the exercise of its discretion saw fit to materially reduce the verdict we are not disposed to reverse the judgment on the ground it was excessive.

Since we find no error the judgment is affirmed.